My name is Alfred Sigman. I'm representing the Plaintiff Appellant, Mr. Brentley Coates. This action arises out of the decision of the fiduciaries of the H.P. Deferred Profit Sharing Plan to eliminate the option of fixed fund investments for Mr. Coates and others similarly situated, despite the fact that over the long history of the plan, the participants of the plan had been encouraged and indeed at some point during their working careers required to transfer, as they aged, 10% of their assets once they reached age 55. I thought the employers made that decision. Is that incorrect? I'm sorry? You said it was the decision of the fiduciaries of the plan solely to make that decision. I thought the employers made the decision to restructure the plan. Is that wrong? No, that's correct. The employers Well, then it was not the decision of the fiduciaries at that level, was it? It was the employers who decided it, correct? The employer decided to make the amendment to the plan to eliminate the option And they are not fiduciaries? They are not fiduciaries. All right. And this question highlights the fact that this case presents, you know, the problem of what happens when an individual is wearing two hats. And it's the submission of the plaintiff in this case that the fiduciary hat plays a role, that the fiduciary hat So who is the individual with the two hats here? I'm sorry? Who's wearing the two hats? The fiduciaries, the defendant fiduciaries, in this case the company. It's a plan sponsor as well as the It's a plan sponsor and fiduciary. And wearing its plan sponsor hat, it decided to eliminate the, in the context of the spinoff of Agilent, it decided to eliminate the fixed fund investment. This is Well, that's no problem. The plan sponsor obviously can do that, whether they trust or is the trustee or not. Obviously, they can do that. And they did it. They can't breach the fiduciary duty in making that decision, period. Well, I disagree with that, Your Honor, because Well, I know you do, but I think that just isn't the law. You can always argue that fiduciaries can't do something really stupid, even if the plan changes. Like an ESOP, for example, you can always make that argument. But to say that there's a breach of fiduciary duty when the plan sponsor amends the plan, that just doesn't, let me put it another way. Tell me your best case that says when the plan sponsor amends the plan, if the plan sponsor is a trustee, it is a breach to fiduciary duty. What's your best case for that? I can refer you to the ESOP cases where the courts have held that it's appropriate under certain circumstances for a fiduciary to disregard the instructions of the plan sponsor. Correct. They have said that in the ESOP area. That's absolutely correct. But they did not say, if I'm not mistaken, that that does not, that involves the trust store, the plan sponsor, in a breach of fiduciary duty. The plan sponsors didn't breach any fiduciary duty in amending the plan. That has to be, we have to take that as a ground rule, don't we? You can argue about what the trustee should have done, but that's not the point. Yes, no, I'm not arguing with the legal right of the plan sponsor to amend the plan, to terminate the plan, to take whatever action that it normally could take in the context of its function as a sponsor. So they breached no fiduciary duty in doing that. And so they've told the trustee of the plan, the fiduciaries of the plan, this is what you're to do. And now the question is what analysis should take place on the part of the fiduciaries in regard to carrying out that particular instruction? The question is, if they carry out that instruction, are they violating their fiduciary duty? Correct. Correct? But we're away from the amendment being a violation, correct? Exactly. We don't allege that the, that in its plan sponsor capacity. Well, we just started arguing it that way. I'm sorry if I gave that impression. I just want to make sure that we're very clear on what we're talking about. We're talking about the plan fiduciaries follow the terms of the plan and violate their fiduciary duties by so doing. That's your argument. That's correct. Because under these particular circumstances, we've had a long history of the plan encouraging people to move as they age into fixed income investments for various reasons which the company explained. You want to reduce volatility. You want to assure a low of income. You don't want to, as what happened to Mr. Coates in this particular instance because of the actions of the fiduciaries in blindly implementing the instruction of the plan sponsor, you don't want to, at age 62, as you're approaching retirement They may have been very good reasons for doing that, but those reasons were, I mean, the possibility of doing that was eliminated when they merged the plans. I wouldn't say that the possibility was, the possibility was eliminated You no longer had two funds, but if you look at it, I'm sorry, you no longer had two, what used to be is they started you out heavily into stocks and then as you got close to retirement they moved you into bonds, they moved you to bonds. That was no longer possible because there were, the two funds were merged. Essentially the bond fund was eliminated. The bond fund was merged into the overall fund, fund A and fund B. B was the fixed income fund. A was the mixed fund. It became one fund. But the consequence of that to my client was that his fixed income portfolio was reduced from almost 99 percent to about 35 percent. But that was still planned sponsorship, wasn't it? I'm sorry. That was still planned sponsorship. Yeah, but the fact that the instruction came from the plan sponsor does not totally abrogate the responsibility of the fiduciary to say, hey, look, wait a minute, we have been encouraging these participants for 30 years as they aged to take what we considered and advised them to be the prudent step of moving into fixed assets, don't focus on the bubble, don't focus on the go-go years, and act in a prudent fashion consistent with the goals of someone who is approaching retirement. Now, I don't believe that So when the two funds were merged, that was when the fiduciary duty came into play? I'm sorry? When the two funds were merged is the time when the fiduciary responsibility There's a gray area. The merger of the two plans occurred while Agilent and HP were still one entity. There's about a two or three month period where decisions appear from the record, and of course we did not have the opportunity to engage in discovery, but it appears that to the participants of the plan, eliminating fund B was signed by both companies, the fiduciaries of both companies, or it was a fiduciary communication issued by the companies And that was proper plan sponsorship? Right. As plan sponsors. Now, there were many things that the fiduciaries could have done in the exercise of their due diligence and responsibility. They could have educated the plan sponsor as to the history. They could have pointed out, as the record demonstrates, that these people didn't fit, particularly given the fact that they had a short time horizon. They could have placed a telephone call. They could have said, hey, look, we have 1,500 people here who, on the verge of retirement, are going to be dumped into the type of fund which is inappropriate Let's forget history for a moment. Let's pretend that this is being generated right now. It's a new plan being devised. Is it your position that the trustees of a ERISA pension plan have an obligation to change the investments for different beneficiaries, and that the different beneficiaries of the plan, depending on the person's age, health condition, etc., etc., so that, in effect, they have to say to themselves, OK, this group of people is a group between 55 and 60. We better invest it this way for that, those particular people, even though it's only one family. This people is from 60 to 65. We better invest it a different way for them. These folks are 40 to 45. We better invest it a different way for them. Do fiduciaries have to make that kind of a determination when they are handling a pension plan? I would not challenge that. The ability of the fiduciaries or the right of the fiduciaries I'm talking about their ability. I'm talking about the obligation of the fiduciaries. I would say that under those circumstances, without the history that we have here, they would be obligated to follow the instruction of the plan sponsor. There's no red flag that's posited in the hypothetical. Well, but the facts remain the same, don't they? Never mind the history. If I'm, I presume you're saying that I'm from 60 to 65, then I need a different set of investments than somebody from 50 to 55 or 40 to 45 needs. Investment counselors would tell me that, I suppose. So that's true whether there's a history or not a history. The participant can plan, can make his life plans based on the particular reality, the particular investment options that are available to him under this new plan that the Court has just, that Your Honor has just posited. But here we have a situation where there are decades of history where the plan fiduciaries themselves had encouraged the participants of the plan to go into the fixed income investment as they aged. So the history simply cannot be ignored in this particular case. It's what makes it sui generis. And I don't think that the sky is going to fall in terms of eliminating the discretion of the plan sponsor to change or incorporate the plan absent the specific facts and circumstances that were present here. I can point out to the Court that the type of fiduciary analysis or investigation that should have been done was, in fact, begun by the plan administrator and a consultant. There was an e-mail exchange that went back and forth. Hey, do these people fit? I don't think that they fit. We now no longer know exactly what we're dealing with here because we've suddenly moved these short-time horizon people in with the long-time horizon. Now, that can't be ignored by a fiduciary who's responsible to act solely and exclusively in the interest of the participants. So I'm not exactly sure what would you expect it to have done. There was one fund, right? And as I understand it — I think when they got the instruction from the fiduciaries to eliminate Fund B, I think frankly — From what fiduciary? — the first thing that should have been done was to call up human resources and say, look, we've had this history. Dr. Packard had for 35 years encouraged people as they age to move into the less volatile fixed fund investment. We have 1,500 people here. So they should have argued with the plan sponsor, the employer, and said, don't do this. Don't — I wouldn't say argue. I would say start with a telephone call. Well, no, I understand. But if they refuse to — It's hard to get them to not make the change. Exactly. Or to make some accommodation so as to minimize the adverse impact that this decision would have on the participants. But we don't know — For example, they could have dollar-cost averaged. We don't know what the employer would have done in that case. But let's say they proceeded with it anyway. And here they are managing this new fund that's now a merger of the two old funds. What could they have done at that point? Well, I think at that point that the fiduciary had attempted to educate — first educate the plan sponsor, human resources department, as to the history and the effect that the decision would have if the plan sponsor refused to comply. The fiduciary could make the suggestion that an independent fiduciary be appointed to make the decision. The fiduciary could have resigned. The fiduciary could have brought suit to protect the interests of the participants. There are any number of actions that the fiduciary could have done. The fiduciary could have — you know, once again, I don't think we're moving into a sky-is-falling type of scenario because we have no idea exactly how human resources would have responded. They might have said, well, 1,500 people — What they could not have done is to say, oh, we're going to take the people who are between 60 and 65 and allocate to them only bonds. It was a unified fund. There was no — there was no way they could — Well, one of the suggestions — Subclasses. One of the suggestions that the consultant and administrator talked about was instead of doing what they did, give Mr. Coates and other people similarly situated who had been invested in Fund B a one-time allocation between the two — between the two funds, equity — mixed equity and fixed and fixed. That was one of the suggestions that was made. And, you know, once again, this case was dismissed without the opportunity to engage in any discovery, so we don't know what happened, if anything, to that particular type of discussion. But the brief factual record that we have indicates that it would not have been a major problem to have accommodated the interests of these people who had been encouraged all their lives to go into fixed income. They certainly should have taken steps to at least inform the plan sponsor as to what the history was. And instead of doing that, they lied. And that's the implication of eliminating any responsibility on behalf of a plan sponsor to exercise any degree of discretion regarding this type of an instruction. They had information from a consultant. They had information from the administrator. These people don't fit. Instead of doing anything about it, they then wrote a letter to all the participants of the plan, and they said, we're making this change, and this change is mandated by securities law. That's a false statement. So the implication of completely eliminating, completely deferring to the plan sponsorship function leads exactly to what we found here in this case, the encouragement of fiduciaries to make false statements to beneficiaries of their trust because they're acting in the interest solely of the plan sponsor, rather, on behalf of the plan participants. And, you know, I would submit to the Court we don't have to engage in hypotheticals. That's exactly what happened in this case. No investigation, and apparently no sense of loyalty whatsoever to all of these people who were let out on the limb, and moreover, a cover-up. We're going to tell you people a lie so that if you have any inclination on your own behalf to go to the Human Resources Department and make some complaint, you won't know what the true facts are. Point out to the Court that one of the cornerstones of the fiduciary duty to the plan participants is truth-telling. And the regime that HP and Agilent argue for here today encourages not only a blind eye to actions that adversely affect the participants, but also false statements, which, under the analysis of the defendants in this case, can go un-remedied. You think the trustees have a responsibility to write to the – and say you're getting a really raw deal here? You should protest about it? You know, to the old participants. I mean, let's say the 60, 65 group. I think the fiduciaries say, you know, you're really getting a shaft. Yes, I think that if the – if the fiduciary – I think if the fiduciary knew at the time, the plan administrator, the person communicating to the plan participants knew at the time that the excuse that we have to divest Fund B, the fixed income fund, because of securities law violation was a false statement, then, yes, I do think they were under an obligation to affirmatively advise the participants, we are under this – if they felt they couldn't do anything else, we are under the duty to follow this instruction, but by the way, the reason given to us is false. Yes, I think that the duty to tell the truth to the plan participants trumps the – what happened here, which was really basically on behalf of the plan sponsor to tell a lie to the participants. And the result of disregarding the history, failing to do any investigation, is that these participants not only were dumped into, at this point close to retirement, dumped into the – to a plan which was wrong for them in terms of their – where they were at their particular station of life, but, as I said before, also encouraged falsehoods. We have a couple of minutes left. Do you want to say a little more? I'll reserve for rebuttal. Thank you. May it please the Court. My name is Joe Bush. I represent Hewlett-Packard and the Hewlett-Packard Deferred Profit Sharing Plan. I will take ten minutes and defer the rest of my time to my colleague, Mr. Tell, who is representing Agilent. There are two issues that have been posed here. The first is whether an ERISA plan participant states a claim for breach of fiduciary duty by alleging that a plan sponsor amended a plan to eliminate an investment option that the participant prefers to the remaining investment option. I think we heard counsel acknowledge in response to questions by Judge Fernandez that the answer to that question is no. He said they should have educated the plan sponsor. That doesn't change the answer. It doesn't change the answer because the communications that took place between Elizabeth Obershaw and Professor Sharp took place in April of 2000, before the amendment to the plan, before the plan was changed and amended by Hewlett-Packard. And Hewlett-Packard, as plan sponsor, is permitted to consult whomever it wants and accept or reject that advice in terms of the design and the structure of the plan. And we know that the courts, for example, in the Hunter case, that it's a plan design function in terms of how you determine what funds are established for purposes of investment of a plan. But then can you make statements that are inaccurate? If I may address that, Your Honor, yes. The answer is no. I'm going to answer your question, though, yes. This is an attempt to bring the matter under verity versus how. And I do have to correct one statement made by counsel. Hewlett-Packard answered the complaint and then complied with Rule 26 in terms of the initial disclosures. My electronic file of the document production in the case is 15 megabytes. It's huge. We provided all kinds of information. We provided a privilege log. The privilege log shows, for example, that there was an opinion issued by Mr. Berry of Orrick Harrington here in San Francisco after Professor Sharpe's statement relating to securities issues in the split-up and division of the two plans between Hewlett-Packard and Agilent. Counsel says that there was never a securities law issue. Counsel has not cited to one statute, not one regulation, not one decision that would suggest that there would not have been a securities law issue under the 1940 Investment Act relating to the splitting up of the two plans. There is nothing there. Let's go to the second point. Counsel said, we were never told that it was a raw deal. Excerpts of record page 18 that counsel put into this record before this Court shows that in the May 4, 2000 communication, the participants in the plan were specifically told that the elimination of Fund B would result in the placing of all of their funds into the diversified portfolio and that the diversified portfolio, because it had equity investments, was more risky than Fund B. They were told that. So they were told that if there was an issue, they had it. Now, to come under Verity v. Howe, however, which is what counsel is trying to do, he has to allege that there was a misrepresentation. He must then allege that there was reliance, that they did something affirmative. And in this instance, there was nothing that a participant could do. They were already assigned to Agilent. They could have quit their job, but they didn't. They stayed in the status quo. Then there must be ---- What would have happened if they had quit? Then he would have received his account balance if he had entered into pay status. In the new fund? Whatever it would have been at that time. On May 4th, he could have ---- So he pulls his money out? On May 4th, he could have quit his job, or May 5th, or May 6th, and then his status would be determined as of May 31st. They would have taken it out of either A or B, whichever was available. Well, at that point in time, on May 31st, it was funds A and B, because we know that based on the calendar, I think it actually happened on June 2nd. I'm sorry. So he gets his account balance. He would have quit his job. That was my question. Yes. Why did he have to quit his job? Does he get the cash? The terms of the plan, and we have the plan in evidence. In this case, it's the Agilent plan, and I'm not as acquainted with the Agilent plan. Just give me an answer. The answer is if he's over age 55, he could request the balance of his account on May 31st. You said balance. You mean that he could just get the money? Yes. Whatever the value is. I don't know if that's what you're ---- Okay. It's a defined contribution plan. So he would have had an account balance. They get ---- And he just said give me a check. Give me a check. He would have received that check. And then he would have dealt with the tax consequences. He would have dealt with the tax consequences, or he could have rolled it over to an IRA or something. Or he could have rolled it over to an IRA. He could have rolled it over. But he would not have his job at Agilent. But that was an option. That was an option for him as an individual. And insofar as there was a misrepresentation, that was an option that was denied to him? No, because the misrepresentation ---- Insofar as there was a misrepresentation. If they lied. If they lied. No, Your Honor, because let's assume that he had lied. Okay? Did he take an action? Remember that we also know that in the excerpts of record, he is told that his ---- it is going to be put into Fund A. And that Fund A is more risky. He was told that. That was a true statement. There's no dispute over that. But he has to have done some form of affirmative reliance on the misrepresentation. Such as quitting his job. Such as quitting his job. And he didn't do that. That would have been his choice. No, but it's one thing to be told, look, we are forced to make this change because it is required by securities laws, which we're now assuming was a lie. Right. And to be told we're doing it because it's our convenience, and even though we know it's going to sort of disadvantage you, we are going to do it anyway because we're saving money on it ourselves. It doesn't matter because, first of all, you're assuming that it was a misrepresentation. There's no evidence in the record at all. I said if. Okay. You can argue with it. But even still, it does not result in him taking any action. What you're saying is that the reason they did it is not such as to cause somebody to either quit or stay. Correct. How do we know this? How do we know this? Well, it's not alleged, Your Honor, in the complaint. Well, he was given, he amended the complaint one time in the face of Judge White's August order and was told specifically at that time what was needed to be alleged. And he raised the issue of the Verity case on the first motion to dismiss. But when you go back and you look at it, what is happening here is an amendment to a plan where you have an accrued you can amend a plan for any reason as long as it does not affect an accrued benefit. And that's when you look at the history of it. You do not have an accrued benefit. It wasn't a wise thing to do from the point of view of the older plan members, was it? To move them out of bonds and heavily into equities. But that is a settlor decision. And as the court in the Seventh Circuit said, if you're willing to pay the cost of the plan now. I realize it. I realize it. But you haven't answered my question. It may or may not have been, Your Honor. It was a diversified fund, wasn't it? It included bonds as well as stocks. It went into a diversified fund, a completely diversified fund that the plaintiff has indicated that he is unwilling to say was imprudently invested. And this would be the first case, unlike the Aesop cases where you have a nondiversified issue and the question is should it be diversified, in this case we put it into an appropriately diversified vehicle. Well, what's appropriate may depend on your investment horizon. If you're dealing with a horizon of 5 years, things may be imprudent. That would be perfectly prudent if you're dealing with a 20 or 25-year investment horizon. And that goes to Judge Fernandez's question about doing it in terms of if we accept your argument that we then have to have different investment horizons for each and every group of participants. I need to cede to Mr. Tell. Thank you. May it please the Court. I'm Gary Tell on behalf of the Agilent Technologies, Inc., Deferred Profit Sharing Plan and Agilent Technologies, Inc. Just to clear away the underbrush on the Verity claim, there are a lot of problems with the Verity claim. First, he doesn't plead it. Verity held that under 502A3, 1132A3, 29 U.S.C., in order to present a misrepresentation claim, that claim can only come in for equitable relief, which has been narrowly defined by the Supreme Court as well as in this circuit. They're seeking monetary damages from fiduciaries into the plan. They didn't plead that. They're not seeking the relief that you would be entitled to under Howell v. Verity. Second, they didn't plead detrimental reliance. The law of misrepresentation is very well developed, Your Honor. Detrimental reliance, causation between the purported misrepresentation and the loss, not play. So I would contend that it's not pled. It's not properly raised before this Court. And they couldn't get it anyway. As to the settler-fiduciary distinction, it's well established, and we all agree, creating a plan, amending a plan, terminating a plan falls outside the scope of ERISA's fiduciary duties. No disagreement there. Here, Agilent created a new plan. This is classic settler activity. The creation of a new plan. The plan called for one diversified fund, 65 percent equities, 35 percent fixed income within a month. Classic settler activity. So where are we left? We have to override the plan document for appellant to prevail. But this Court has never found a circumstance where it was necessary to override a plan document under any circumstance. The closest you can find are the ESOP cases, Wright v. Oregon Metallurgical. This is an easier case than that. That's a single stock. In that particular case, the plan called for all participants to hold 15 percent. Well, but ESOPs are sui generis, too. I mean, ESOPs don't require diversification, and they contemplate investing in the company's own stock. So by selecting ESOP, you are in a different universe. I agree completely, but it happens to be the closest place. This, in fact, our plan called for a broad array of diversification, hardly a high-flying speculative investment scheme, 65 percent in equities broadly across the market, a 35 percent. That's a lot different than 95 or 99 percent fixed assets. And if you are looking at a 5-year investment horizon, having 65 percent equities may, in fact, be a very bad idea. Which is why they had had the separate plans to begin with. It's true, Your Honor, and it's a settler decision to merge the plans. Now, it's important to bear in mind that that argument, basically, is that the fiduciary has an obligation to override in order to take into account segments of the population. But how do we cabin the implications of that? Do we have to have a fund C for participants who are younger? We'll get a law clerk to work on it. For a law clerk. Exactly. That's the problem. Cabining. We are very good at cabining. Cabining. But it's not the law. I'm sorry? It's not the law. The law doesn't require that. There's not a single case that says you have to take into account. Why didn't you make it the law? Why don't you tell me why it's a bad idea for us to make it the law? I mean, it strikes me. Here is a situation where these beneficiaries are at the end of their investment horizon, at the end of their careers, and, you know, where they have the greatest need for something fixed, you know, not get other things that are high flying. And the plan sponsors know this, and the fiduciaries know this. And nobody tells them. Nobody tells them, you know, get out. You know, if you want your money now, avoid doing this. You should think about quitting or retiring early. Or, you know, I don't know what opportunities they would have to do that. And it's done, even though they're fully aware that this is a really bad investment for this group of people that was over here. And, you know, I see you pointing the finger at them, and I point the finger at you. It's nobody's fault. First of all, it's completely within the company's rights to do this. There's no law that would require them to override. Moreover, Congress has required diversification in other settings. Let's take ESOPs. I know it's not our situation, but the tax code, 26 U.S.C. 401-A28, requires a plan, if you want to be tax qualified, to permit diversification to participants age 55 with 10 years of service. It doesn't specify how. It doesn't say you have to have a bond fund. It says you just have to leave this single stock so your fate is tied to one company and be allowed to go into the broader market. And there are other circumstances in ERISA, not here, where Congress has limited it. We rely on the responsibilities of trustees to act responsibly. I mean, we – it isn't they can do anything they want. They can't just say, you know, we're going to Vegas and put them on the Red. They couldn't do that, right? Correct. But you should – But you'd defend it if they did, huh? If I had to, Your Honor, but I wouldn't look forward to it. I understand. Tax code. The point here is, Your Honor, for them to prevail, they're asking you to legislate from the bench, to substitute your judgment for Congress. Oh, how horrible. Horrible. That's so awful. Legislate from the bench. Please decline. There's a thought. Please decline the invitation. Please decline. You know, I've been sort of judiciary for so long. A little legislating wouldn't be so bad. Can't this confirm? Can't I please? There are other circumstances where Congress has spoken, put simply. It hasn't here. There's no restriction on the plan sponsor to do this. Maybe it was a good idea. Maybe it was a bad idea. But it's completely within their rights to do it. And it would be a very strange result indeed. For fiduciary to be required. What if the trustees have looked at it and said, look, this is really awful. This is really awful. We're just not going to do it. You know, we looked at this. We've consulted with that professor from Stanford. It could happen. You know, imagine a vesting. What happens if they just sort of say, look, we're just not going to do it? If a plan. What, do they get fired? What will happen next? Well, imagine a plan document that had something illegal in it. That's too easy. If it's illegal, nobody can force it. You know, come on. Let's say something just highly imprudent. Just highly imprudent. Say, you know, what they're going to do is get into penny stocks or what do you call them? Invest 100% of the plan in gold. That would be a diversification requirement perhaps. And a violation of the diversification provision. Yeah, but you keep getting into violations. So if it's not a violation, if it's just. It's not a violation. It's just a really, really bad idea. It's just the gray area. But really, they decide, you know, there's no diversification for this in terms of the plan numbers. It's just a really bad idea. I mean, highly risky. The kind of risk that we don't think is prudent for this particular purpose. We're just not going to do it. Well, what happens at that point? They would not. They would be sued. They would be sued for not adhering to the plan document. It would be sued by whom? They could be sued by the participants and beneficiaries of the plan. Remember, we're talking about hindsight here, Monday morning quarterbacking. You know, if this lawsuit was brought three, you know, several years after, this lawsuit was not brought at the time that Fund B disappeared and was merged into Fund A. This is if, for example, the tech market did not turn down but continued to go up, this plaintiff would have done fabulously well. Without benefit of hindsight, we have a lawsuit, perhaps. With the benefit of hindsight under your example, we'd likewise have a lawsuit. You took us – you didn't allow us into the market. You kept us in bonds. See, this is an easier case than the other cases we've seen, like in the ESOP context. It would be a very strange result for a fiduciary to overrule a plan document provision that requires a diverse mix of investments. That's what the plan document said, Your Honor, in the record. Okay. I assure you, whatever we do, we're not going to legislate from the bench. You can rest assured. I have nothing further, Your Honor. Thank you. All right. I think you have some time. Thank you, Your Honor. Okay. Thank you very much. Case recyclable sensibility. We'll take a short recess. Only about five minutes before we hear the last case on the calendar.
judges: Kozinski, Fernandez, Hatter